THIS OPINION
IS A PRECEDENT OF THE
TTAB

Mailed:  12/23/09

**UNITED STATES PATENT AND TRADEMARK OFFICE**

————

**Trademark Trial and Appeal Board**

————

In re Jack B. Binion

————

Serial Nos. 76590702 and 76590729

————

Sana Hakim and Kathryn Starshak of K&L Gates for Jack B. Binion.

Evelyn Bradley, Trademark Examining Attorney, Law Office 105 (Thomas G. Howell, Managing Attorney).

————

Before Quinn, Walters and Rogers, Administrative Trademark Judges.

Opinion by Quinn, Administrative Trademark Judge:

Jack B. Binion filed, on May 6, 2004, intent-to-use applications to register the marks BINION (Serial No. 76590729) and BINION'S (Serial No. 76590702) (both in standard character form) for "casino and gaming services" in Class 41, and "hotel and bar services" in Class 43.[1]

The trademark examining attorney refused registration

---

[1] The recitation of services in each application originally included "restaurant services."  In response to the Section 2(d) refusal discussed herein, applicant deleted these services from the recitation.

in each application on the following grounds: 1) that applicant's mark, when used in connection with applicant's services, so resembles the previously registered mark BINION'S ROADHOUSE (in typed form) ("ROADHOUSE" disclaimed) for "restaurant services"[2] as to be likely to cause confusion under Section 2(d) of the Trademark Act, 15 U.S.C. §1052(d); 2) that applicant's mark is primarily merely a surname under Section 2(e)(4) of the Trademark Act, 15 U.S.C. §1052(e)(4); and 3) in the event that the determination that applicant's mark is primarily merely a surname is affirmed, then applicant's evidence of acquired distinctiveness under Section 2(f) of the Trademark Act, 15 U.S.C. §1052(f), is insufficient to establish registrability on the Principal Register.

When the refusals were made final, applicant appealed. Applicant and the examining attorney filed briefs.

The appeals involve common issues of law and fact. Further, the records are essentially identical. Accordingly, we decide the appeals in this single opinion.

Before turning to the merits of the refusals, an evidentiary matter requires our attention. Applicant submitted, for the first time with each supplemental appeal

---

[2] Registration No. 1996212, issued August 20, 1996; renewed.

2

brief, Exhibits A, B and C. Exhibits A and B comprise TARR printouts of third-party registrations, and Exhibit C is an excerpt retrieved from registrant's web site. The examining attorney, in her appeal briefs, objected to this evidence on the ground that it is untimely submitted.

Trademark Rule 2.142(d) provides that the record in the application should be complete prior to the filing of an appeal, and that the Board will ordinarily not consider additional evidence after the appeal is filed. Accordingly, given applicant's untimely submission of Exhibits A, B and C with his supplemental appeal briefs, the examining attorney's objection is sustained, and we have not considered this evidence in making our decision.

## Likelihood of Confusion

As noted above, a previously issued registration of the mark BINION'S ROADHOUSE for "restaurant services" has been cited as a Section 2(d) bar against registration of applicant's marks BINION and BINION'S for "casino and gaming services" and "hotel and bar services."

The thrust of applicant's argument is that he owns three registrations of marks comprising JACK BINION or JACK BINION'S (one in typed form, the other two in special form) for "restaurant services," and that these registrations

3

issued over the registration now cited against the two present applications. Applicant claims that his prior registrations have peacefully coexisted with the cited registration for a number of years. In support of his arguments, applicant submitted copies of his prior registrations.

The examining attorney maintains that the marks are similar and that the services are related. Further, the examining attorney finds that applicant's ownership of three prior registrations for marks different from the two marks involved herein does not warrant issuance of the registrations presently sought. In support of her refusal, the examining attorney submitted several third-party registrations showing that the same entities have registered the same mark for casino, gaming, hotel, bar and/or restaurant services. The examining attorney also introduced excerpts from third-party web sites showing that the same entities that offer casino and hotel services also offer restaurant services.

Our determination of the issue of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d

1357, 177 USPQ 563 (CCPA 1973). *See also In re Majestic Distilling Co., Inc.*, 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). In any likelihood of confusion analysis, however, two key considerations are the similarities between the marks and the similarities between the goods and/or services. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24 (CCPA 1976).

Turning first to a consideration of the marks, we must compare the marks in their entireties as to appearance, sound, connotation and commercial impression to determine the similarity or dissimilarity between them. *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005). The test, under the first *du Pont* factor, is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression that confusion as to the source of the services offered under the respective marks is likely to result. The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *See Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106 (TTAB 1975).

With respect to registrant's mark BINION'S ROADHOUSE, it is well settled that one feature of a mark may be more significant than another, and it is not improper to give more weight to this dominant feature in determining the commercial impression created by the mark. *In re National Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985) ("There is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties. Indeed, this type of analysis appears to be unavoidable."). *See Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002). For example, in the past merely descriptive matter that is disclaimed has been accorded subordinate status relative to the more distinctive portions of a mark. *In re Dixie Restaurants Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1533-34 (Fed. Cir. 1997). In the cited registration, registrant disclaimed the word ROADHOUSE. Given the merely descriptive or generic nature of this word in registrant's mark, registrant's mark is clearly dominated by the term BINION'S. This dominant portion of the restaurant's full name is the term most likely to be remembered by consumers, and will be used in calling for the services or otherwise

in referring to registrant's restaurant. Although we have not disregarded the word ROADHOUSE in registrant's mark in our comparison of the respective marks as a whole, it is entitled to less weight than the term "BINION'S" because merely descriptive or generic words are accorded less weight in the likelihood of confusion analysis. *See In re Chatam International Inc.*, 380 F.3d 1340, 71 USPQ2d 1944 (Fed. Cir. 2004).

The dominant portion of registrant's mark, BINION'S, is identical to the entirety of applicant's mark BINION'S. Further, the dominant portion of registrant's mark is virtually identical to applicant's mark BINION, differing only by the concluding apostrophe "S" that may be viewed as the possessive form of BINION. The absence of the possessive form in applicant's mark BINION has little, if any, significance for consumers in distinguishing it from the cited mark. *See, e.g., Wilson v. Delaunay*, 245 F.2d 877, 114 USPQ 339, 341 (CCPA 1957); and *Georgia-Southern Oil Inc. v. Richardson*, 16 USPQ2d 1723, 1725 (TTAB 1990).

So as to be clear, we must do more than just compare the dominant portion of the registered mark with applicant's marks; it is necessary that we compare the registrant's mark as a whole. In comparing each of applicant's marks BINION and BINION'S with registrant's

7

mark BINION'S ROADHOUSE, we find that the marks are similar in sound, appearance and meaning. Further, given these similarities, we find that the marks engender very similar overall commercial impressions.

The similarity between the marks is a factor that weighs in favor of finding a likelihood of confusion.

Insofar as the services are concerned, it is not necessary that the respective services be competitive, or even that they move in the same channels of trade to support a holding of likelihood of confusion. It is sufficient that the respective services are related in some manner, and/or that the conditions and activities surrounding the marketing of the services are such that they would or could be encountered by the same persons under circumstances that could, because of the similarity of the marks, give rise to the mistaken belief that they originated from the same producer. *In re Melville Corp.*, 18 USPQ2d 1386 (TTAB 1991). The issue, of course, is not whether purchasers would confuse the services, but rather whether there is a likelihood of confusion as to the source of the services. *In re Rexel Inc.*, 223 USPQ 830 (TTAB 1984).

The comparison at issue here is between registrant's "restaurant services" and applicant's "casino and gaming

8

services" and "hotel and bar services." At the outset of consideration of this factor we note that applicant's original recitation of services included "restaurant services"; in response to the Section 2(d) refusal, applicant deleted these services from his recitation. Further, registrant's services are not limited and thus must be construed to encompass all types of restaurant services, including stand-alone restaurants as well as restaurants that may be located within a hotel or casino. *See In re Smith & Mehaffey*, 31 USPQ2d 1531 (TTAB 1994).

The examining attorney and applicant have introduced competing third-party registration evidence in support of their opposing arguments regarding the similarity between the services. The examining attorney submitted ten use-based registrations showing that each registrant adopted a single mark for both restaurant services and at least one of the services listed in applicant's applications (casino, gaming, hotel or bar). Applicant countered with registrations showing that different entities have registered similar marks for both types of services.

Given the nature of the services at issue, it is not surprising that there are numerous third-party registrations showing that each registrant adopted a single

9

mark for casino, gaming, hotel, restaurant and bar services, as for example, PARIS and BEVERTAINER.

Applicant introduced two instances wherein registrations issued to different entities for arguably similar marks, with one registration covering, for example, restaurant services, and the other registration covering casino or hotel services.[3]

We find that the third-party registration evidence, on balance, weighs in favor of the examining attorney's position. "Third-party registrations which cover a number of differing goods and/or services, and which are based on use in commerce, although not evidence that the marks shown therein are in use on a commercial scale or that the public is familiar with them, may nevertheless have some probative value to the extent that they may serve to suggest that such goods or services are of a type which may emanate from a single source." *In re Mucky Duck Mustard Co.*, 6 USPQ2d 1467, 1470 n.6 (TTAB 1988), *aff'd*, 864 F.2d 149 (Fed. Cir. 1988). *See also In re Albert Trostel & Sons Co.*, 29 USPQ2d 1783, 1785-86 (TTAB 1993).

---

[3] Applicant proffered two additional instances wherein an application was "allowed" over an existing registration. The applications are evidence of nothing more than that they were filed, and there is no indication that either application matured into a registration; the Board does not take judicial notice of status changes in third-party applications made of record.

Further, casinos, hotels, bars and restaurants are often housed under the same roof.  For example, a person visiting a hotel in Las Vegas in many cases would be able to spend the night, gamble, eat and drink in the same establishment.  As evidenced by applicant's original recitation of services that included "restaurant services," coupled with the inclusion of such services in his prior registrations, it is clear that there is a close relationship between, on the one hand, casino, gaming, hotel and bar services and, on the other, restaurant services.  In an interview with Mr. Binion, he even stated that one of the things that makes his Horseshoe properties special is "[w]e have nice rooms, we have real good food, we give you a better gamble..."; and that his properties "have such a strong commitment to food and beverage" because "good food is very important to the customer." (Casino Player (Nov. 2002)).  Another article about applicant indicates that "Jack knows the power of food--I know there are some casino operators that have quality food, but no one, I believe, uses food as a real marketing tool as well as Jack Binion.  He eats in his own buffet and never cuts corners on quality.  He understands the need for a first class, but comfortable steakhouse to feed hungry table game players."  (casinojournal.com (Oct. 2003)).

11

Lest there be any doubt on this obvious point, the examining attorney submitted Internet evidence retrieved from several third-party web sites. In each case, the same establishment offers casino, hotel, bar and restaurant services under the same mark (see, e.g., Bellagio and Hard Rock Hotel located in Las Vegas). Accordingly, although applicant deleted "restaurant services" from the applications' recitations, the remaining casino, gaming, hotel and bar services are closely related to registrant's restaurant services.

As pointed out by the examining attorney, and not disputed by applicant, applicant's and registrant's services are purchased by the same classes of consumers, including ordinary ones who, in many instances, would employ nothing more than ordinary care in making their purchasing decisions about where to gamble, lodge, eat or drink.

Accordingly, the *du Pont* factors bearing on the similarity between the services weigh in favor of a finding of likelihood of confusion.

We also consider the thirteenth *du Pont* factor in this case, namely, any other established fact probative of the effect of use. Applicant owns the following prior

registrations:  JACK BINION'S (typed form) for "restaurant services";[4]

for "casino, hotel, restaurant and bar services";[5] and

for "restaurant services."[6]  Applicant asserts that "applicant's prior registrations were approved for registration despite the existence of the cited mark," and that "in this instance, there is even less a risk of a likelihood of confusion between the BINION [and BINION'S] mark[s] because the subject application[s] do not cover 'restaurant services,' the only services covered by the cited mark."  (Brief, p. 6).  Applicant also states that his prior marks have coexisted with the cited mark for years.

---

[4] Registration No. 2150944, issued April 14, 1998; renewed.
[5] Registration No. 2444446, issued April 17, 2001; Section 8 affidavit accepted, Section 15 affidavit acknowledged.
[6] Registration No. 2607096, issued August 13, 2002; Section 8 affidavit accepted, Section 15 acknowledged.

The coexistence of the cited registration with applicant's three prior registrations, all covering restaurant services, does not compel a different result. To the extent that applicant is making an equitable estoppel argument, it is not well taken. Although the present applications do not list "restaurant services," these applications attempt to register marks that are not the same as the registered marks, but rather are marks actually closer to the registered mark than are any of applicant's three previously registered marks. Further, as discussed earlier, the services are related. As often stated, each case must be decided on its own facts, and occasionally an applicant with registrations for the same or very similar marks may be unable to obtain subsequent registrations. *See In re Sunmarks Inc.*, 32 USPQ2d 1470, 1472 (TTAB 1994) ("We readily admit that in the present case it is troublesome to refuse registration when applicant already owns registrations for the identical mark for the same and/or similar goods. We find, however, that when this evidence is balanced against the other *du Pont* factors, the scales remain tipped in favor of affirming the refusal here."). *See also In re Nett Designs Inc.*, 236 F.3d 139, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001) ("Even if prior registrations had some characteristics similar to

14

[applicant's] application, the PTO's allowance of such prior registrations does not bind the Board or this court."); and *In re Davey Products Pty Ltd.*, 92 USPQ2d 1198 (TTAB 2009). Further, any suggestion that there has been no actual confusion between the marks, based on the coexistence of applicant's previously issued registrations and the cited registration, is entitled to little probative value in the context of this ex parte appeal. *In re Majestic Distilling Co., Inc.*, 65 USPQ2d at 1205.

Applicant also states that registrant operates a single restaurant located in Hendersonville, North Carolina, but registrant owns a geographically unrestricted registration and, thus, registrant has nationwide rights in its registered mark. Applicant asserts that the registered mark is often used with a design, but we must consider registrant's mark as registered, and the registered mark does not include a design. Simply put, the law is clear that these points are entirely irrelevant to our likelihood of confusion analysis.

Lastly, to the extent that any of applicant's points raises a doubt about likelihood of confusion, that doubt is required to be resolved in favor of the prior registrant. *In re Hyper Shoppes (Ohio), Inc.*, 837 F.2d 840, 6 USPQ2d 1025 (Fed. Cir. 1988); and *In re Martin's Famous Pastry*

15

*Shoppe, Inc*., 748 F.2d 1565, 223 USPQ 1289 (Fed. Cir. 1984).

The refusal to register under Section 2(d) on the ground of likelihood of confusion is affirmed.

### Surname

The examining attorney maintains that BINION and BINION'S are primarily merely surnames. The examining attorney contends that she has made a prima facie case, and that the burden falls on applicant to rebut this showing. More specifically, she argues that applicant has failed to support his argument that relevant consumers would regard Mr. Binion as a "historical figure" as contemplated by case law such that "Binion" is no longer primarily a surname. In support of the refusal, the examining attorney submitted evidence retrieved from the NEXIS database, and dictionary evidence.

Applicant contends that he has sufficiently rebutted the examining attorney's showing with evidence "of the historical significance of the term BINION in the gaming industry such that the primary meaning of the term BINION as applied to Applicant's services would not be that of a surname." (Brief, p. 6). Applicant points to the "renown" of the "Binion" name in the gaming industry, relying on a

16

variety of references to Mr. Binion and other family members in the printed press and on the Internet.

The USPTO has the burden of establishing a prima facie case that a term is primarily merely a surname. *In re Etablissements Darty et Fils*, 759 F.2d 15, 225 USPQ 652, 653 (Fed. Cir. 1985). Moreover, "[t]he question of whether a word sought to be registered is primarily merely a surname within the meaning of the statute can only be resolved on a case by case basis," taking into account a number of various factual considerations. Id.  There are five accepted factors to be considered in the analysis:

(1) Is the word a common or rarely used surname?

(2) Does anyone connected with the applicant have that surname?

(3) Does the word have meaning other than as a surname?

(4) Does the word look and sound like a surname?

(5) Is the word presented in use in a stylized form distinctive enough to create a separate non-surname impression?

*In re Benthin Management GmbH*, 37 USPQ2d 1332, 1333-34 (TTAB 1995).

With respect to the first factor, the examining attorney introduced the results of a search of "Binion" using the Lexis/Nexis USFIND database.  This search of a

17

nationwide telephone directory shows 1416 listings of the surname "Binion."  Thus, while hardly a common surname, "Binion" is not so rare that it would not be recognized as a surname.  *See In re Etablissements Darty et Fils*, 225 USPQ at 653; and *In re Rebo High Definition Studio Inc.*, 15 USPQ2d 1314 (TTAB 1990).  Regardless of the rarity of the surname, the test is whether the primary significance of the term to the purchasing public is that of a surname.

The second factor is obvious; applicant's name is "Jack Binion."

The record fails to show that "Binion" has any meaning other than as a surname.  On this third factor, the examining attorney submitted a dictionary excerpt showing the absence of an entry for "Binion."

The fourth factor, whether "Binion" has the look and feel of a surname, is very subjective.  We find that "Binion" looks and sounds like a surname.  The record shows that such term has no readily recognized meaning other than its surname significance.  Further, on its face, "Binion" does not look like a coined term or an acronym, nor like anything else but a surname.  This is especially the case with the possessive form of the term, "Binion's," that serves to reinforce its impression as a surname.

18

Because the marks are presented in standard character form, the fifth factor is not relevant to our analysis.

We find that the examining attorney established a prima facie case that BINION is primarily merely a surname. As to the mark in possessive form, BINION'S, the surname significance of a term is not diminished by the fact that the term is presented in its possessive form. *See In re Woolley's Petite Suites*, 18 USPQ2d 1810 (TTAB 1991). *See also* TMEP §1211.01(b)(v) (6th ed., rev. 1, 2009).

As noted above, applicant attempted to overcome the surname significance by arguing that Mr. Binion is a historical figure. A term with surname significance may not be primarily merely a surname if that term also identifies a historical place or person. *See In re Pyro-Spectaculars, Inc.*, 63 USPQ2d 2022, 2024 (TTAB 2002). Evidence that an individual is famous in a particular field does not necessarily establish that the person is a historical figure. *In re Thermo LabSystems Inc.*, 85 USPQ2d 1285 (TTAB 2007). We do not find that Mr. Binion's personal history is in any way so extraordinary that he warrants treatment under the "historical person" exception to the surname refusal. That is to say, although the evidence of record shows that Mr. Binion has played a significant role in the gaming industry in Las Vegas, his

19

notoriety in this regard is not so remarkable or so significant that he is a historical figure as contemplated by the case law. Id. at 1289.

The refusal to register under Section 2(e)(4) because the terms BINION and BINION'S each are primarily merely a surname is affirmed.

## Acquired Distinctiveness

Although applicant did not originally couch his Section 2(f) claim in the alternative when he continued to argue against the surname refusal, the examination history reveals that applicant and the examining attorney essentially treated the claim as an alternative one. That is, the examining attorney did not treat, nor did applicant intend his claim of acquired distinctiveness as a concession that the matter sought to be registered is not inherently distinctive. See TMEP §1212.02(c) (6th ed. rev. October 2009). Because of the way the issue was handled by applicant and the examining attorney, we will consider the claim of acquired distinctiveness to be one made in the alternative. Cf. TMEP §1212.02(b) (6th ed. rev. October 2009).

As noted earlier, the involved applications are based on an intent to use each mark in commerce as provided under Section 1(b). Section 2(f) is limited by its terms to "a

mark used by the applicant." A claim of distinctiveness under Section 2(f) is normally not filed in a Section 1(b) application before the applicant files an amendment to allege use or a statement of use, because a claim of acquired distinctiveness, by definition, requires prior use. However, an intent-to-use applicant that has used the *same* mark on *related* goods or services may file a claim of acquired distinctiveness under Section 2(f) before filing an amendment to allege use or statement of use, if the applicant can establish that, as a result of the applicant's use of the mark on other goods or services, the mark has become distinctive of the goods or services in the intent-to-use application, and that this previously created distinctiveness will transfer to the goods and services in the intent-to-use application when use in commerce begins. *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 57 USPQ2d 1807, 1812 (Fed. Cir. 2001).

The Board has set forth the following requirements for showing that a mark in an intent-to-use application has acquired distinctiveness: First, applicant must establish, through the appropriate submission, the acquired distinctiveness of the same mark in connection with specified other goods and/or services in connection with which the mark is in use in commerce. To satisfy the first

21

element, the applicant must establish acquired distinctiveness as to the other goods and/or services by appropriate evidence, such as ownership of a prior registration for the same mark for related goods and/or services, a prima facie showing of acquired distinctiveness based on five years use of the same mark with related goods and/or services, or actual evidence of acquired distinctiveness for the same mark with respect to the other goods and/or services.  Second, applicant must establish, through submission of relevant evidence rather than mere conjecture, a sufficient relationship between the goods and/or services in connection with which the mark has acquired distinctiveness and the goods and/or services recited in the intent-to-use application to warrant the conclusion that the previously created distinctiveness will transfer to the goods and/or services in the application upon use.  To satisfy this element, applicant must show the extent to which the goods and/or services in the intent-to-use application are related to the goods and/or services in connection with which the mark is distinctive, and that there is a strong likelihood that the mark's established trademark function will transfer to the related goods and/or services when use in commerce occurs.  *In re Rogers*,

53 USPQ2d 1741, 1744 (TTAB 1999). *See generally* TMEP §1212.09(a) (6th ed. rev. October 2009).

In addition to his reliance on the three previously issued registrations, Mr. Binion claims that he is a nationally recognized leader in the gaming industry and, consequently, that the name "Binion" has become synonymous with the gaming industry. According to applicant, the legacy of the Binion name began in 1951 when applicant's father, Benny Binion, opened Binion's Horseshoe Casino in Las Vegas. Applicant was inducted into the Gaming Hall of Fame in 2004, coming fourteen years after his father's induction. Applicant has owned three casinos, and his sale of the Horseshoe Casino to Harrah's Entertainment was one of the largest casino transactions in history, netting Mr. Binion over one billion dollars. Due to extensive press coverage, applicant asserts that the consuming public primarily associates the terms BINION and BINION'S with applicant's services.

The examining attorney's argument against registration under Section 2(f) is as follows:

> The evidence of record clearly shows
> that the Binion family is very well
> known in the gaming field. Jack is
> apparently a "legend in his field" as
> indicated in some of the evidentiary
> items, as is founder Benny. However,
> virtually all occurrences of the Binion

> name referring to Jack or Benny are
> shown as full names, or as "the Binion
> family," not simply the surname,
> Binion.  Both Jack Binion and Benny
> Binion are in the Gaming Hall of Fame
> and have numerous media articles
> referring to them by name and their
> fame in the gaming industry.  However,
> all this evidence is insufficient to
> show that BINION [or BINION'S] by
> itself is functioning as a mark for
> related services and that applicant can
> claim proprietary rights for 2(f)
> purposes.  It is the full names of Jack
> Binion and Benny Binion that are
> famous, not "Binion" by itself.
> Accordingly, this evidence cannot be
> used to show acquired distinctiveness
> in this application.

(Brief, p. 21).

We find that the evidence of record does not establish that the marks BINION and BINION'S, not yet used by applicant as a trademark or service mark, have acquired distinctiveness under Section 2(f).

Considering first applicant's registration evidence, applicant seeks to register the marks BINION and BINION'S (in standard character form) for "casino and gaming services" and "hotel and bar services."  Applicant already owns registrations of the marks JACK BINION'S (in typed form, issued April 14, 1998, alleging first use dates of December 31, 1996), and JACK BINION'S (in special form in the manner of a signature, issued August 13, 2002, alleging dates of first use of November 15, 2000), both for

24

"restaurant services"; and JACK BINION (in special form in the manner of a signature, issued April 17, 2001, alleging first use dates of October 19, 1997), for "casino, hotel, restaurant and bar services."

The services involved herein are identical or closely related to the services recited in the previously issued registrations; thus, the applicant has met the second requirement for showing that a mark in an intent-to-use application has acquired distinctiveness. The problem for applicant, however, is that he has failed to meet the first requirement to show that his applied-for marks have acquired distinctiveness, namely that the involved marks BINION and BINION'S are the "same" marks as the previously registered marks JACK BINION and JACK BINION'S. *See* TMEP §1212.04(b) (6th ed., rev. 1, 2009). A proposed mark is the "same mark as a previously registered mark for the purpose of 37 C.F.R. §2.41(b)" if it is the "legal equivalent" of such a mark. A mark is the legal equivalent of another if it creates the same, continuing commercial impression such that the consumer would consider them both the same mark. *In re Dial-A-Mattress Operating Corp.*, 57 USPQ2d at 1812. Simply put, the marks BINION and BINION'S intended to be used are not the legal equivalents of the registered marks JACK BINION and JACK BINION'S.

Accordingly, applicant's ownership of the prior registrations does not establish acquired distinctiveness of the marks now sought to be registered. *See* TMEP §1212.04 (6th ed., rev. 1, 2009).

As indicated earlier, applicant also introduced several articles as evidence of the publicity about Mr. Binion and his family. The record includes numerous articles in gaming trade publications and on the Internet that refer to the Binion family and its significant role in the growth of the gaming industry in Las Vegas; as acknowledged by the examining attorney and borne out by the evidence, Jack Binion and other family members are "legends" in the Las Vegas gaming industry, and they have merited induction into the Gaming Hall of Fame. When Benny Binion passed away in 1989, the Horseshoe remained a family business, with Jack Binion in charge. In 1998, after a legal battle, Jack Binion surrendered the presidency of the Horseshoe to his sister, Becky Binion. In later years, Mr. Binion expanded his casinos to Louisiana, Mississippi, Illinois and Indiana. Jack Binion has been called "The Godfather of Poker," based on his involvement in starting the World Series of Poker in Las Vegas; the Jack Binion World Poker Open followed. One of the Horseshoe's most successful promotions has been the "Who Wants To Be a

26

Binionaire" slot machine. At the website "horseshoe.com," in an excerpt about applicant, it is stated that "[t]here are few names more synonymous with the casino industry than the Binion name." Mr. Binion was featured as the cover story in Casino Player (Nov. 2002): "Jack Binion The Man, The Myth & The Magic" ("the name 'Binion' evokes emotion in the gaming world").

The purpose behind Section 2(e)(4) is to keep surnames available for people who wish to use their own surnames in their businesses, in the same manner that merely descriptive terms are prohibited from registration because competitors should be able to use a descriptive term to describe their own goods or services. This purpose is served until such time as the person has used his/her surname as a trademark or service mark to an extent sufficient to establish acquired distinctiveness. Generally, a statement of five years' use will be sufficient to establish acquired distinctiveness. TMEP §1212.05(a) (6th ed., rev. 1, 2009).

All of the evidence submitted by applicant shows that purchasers would regard "Binion" or "Binion's" as a surname; it is the surname of Jack, as well as Benny, Jack's father, and Becky, Jack's sister. The record is devoid of any use of the term "Binion" or "Binion's" as a

27

trademark or service mark, let alone use to an extent sufficient to show acquired distinctiveness. Simply put, the renown of Jack Binion and the Binion family name in the gaming industry does not establish that "Binion" is no longer perceived as a surname by purchasers, but rather as a service mark for services emanating from applicant.

We have considered each piece of Section 2(f) evidence in light of the rest of the Section 2(f) evidence. We conclude that this evidence, when considered as a whole, is insufficient to show acquired distinctiveness of the surnames "Binion" and "Binion's."

**Decision:** In each application, the refusal to register under Section 2(d) on the ground of likelihood of confusion is affirmed. And in each application, the refusal to register under Section 2(e)(4) on the ground that the term sought to be registered is primarily merely a surname is affirmed, and applicant has not shown its mark has acquired distinctiveness.